CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

DEC 0 6 2013

JULIA C. DUDLEY, CLERK
BY: _____
    DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Roanoke Division

| | | |
|---|---|---|
| PONANI SUKUMAR, | ) | Case No.: 7:11-cv-00218 |
| and | ) | |
| SOUTHERN CALIFORNIA | ) | |
| STROKE REHABILITATION | ) | **MEMORANDUM OPINION** |
| ASSOCIATES, INC., | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | By: James C. Turk |
| | ) | Senior United States District Judge |
| NAUTILUS, INC., | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the Court on cross-motions for summary judgment. Plaintiffs Ponani Sukumar ("Sukumar") and Southern California Stroke Rehabilitation Associates, Inc. ("SCSRA") have filed a renewed motion for partial summary judgment, ECF No. 136, in which they cite to new evidence in seeking some of the same rulings as a matter of law that the Court previously denied. See ECF No. 103 (Memorandum Opinion granting in part and denying in part Plaintiffs' Motion for Partial Summary Judgment, ECF No. 80). Defendant Nautilus, Inc. ("Nautilus") has filed its own summary judgment motion, in which it seeks judgment in its favor as to all claims asserted by Plaintiffs, primarily on the grounds that Plaintiffs have insufficient evidence of damages caused by Nautilus's conduct. ECF No. 138. The parties argued both motions before the Court on September 17, 2013, and the motions are now ripe for disposition.

As explained in more detail below, summary judgment is appropriate as to Plaintiffs' claim under the federal false patent marking statute, 35 U.S.C. § 292, because Plaintiffs have produced insufficient evidence of a "competitive injury," which is required to show standing under the revised statute. Similarly, as to their state law claims under California and Washington law, the Court concludes that Plaintiffs have failed to put forth sufficient evidence from which a

jury could find that they suffered an injury proximately caused by Nautilus's violations of those statutes. For these reasons, explained in more detail below, Defendant's Motion for Summary Judgment, ECF No. 138, is GRANTED, and Plaintiffs' Motion, ECF No. 136, is DENIED AS MOOT.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Factual Background

At the outset, the Court notes that the cross-motions and related filings are voluminous, contain extensive exhibits, and address a number of issues that the Court will not reach in this opinion.[1] For example, it will be unnecessary to address Plaintiffs' motion for summary judgment at all (which focuses entirely on issues related to liability), because the Court's conclusions as to damages render Plaintiffs' motion moot. Accordingly, in discussing the factual background of the case, the Court focuses on the background most pertinent to the issues in this opinion and omits a discussion of the background related to many other legal issues raised by the parties. Primarily, the Court focuses on the facts related to damages, since the lack of proof of damages caused by Nautilus's conduct is the basis of the Court's ruling.

Nautilus is a publicly-traded American corporation, headquartered in Vancouver, Washington. ECF No. 138-6, Murdock Decl. at ¶ 2. It has been in the exercise and fitness equipment industry for over twenty-five years and develops, manufactures, and markets several

---

[1]   The parties' briefing in this case has included not only the usual response and reply to each motion, but also documents objecting on various grounds to certain evidence and testimony submitted by the opposing party. Also, Defendant has filed a request for judicial notice as to several documents, ECF No. 138-7 at 2-3, and a separate statement of undisputed facts with supporting record citations. Plaintiffs object to the separate statement of facts on various grounds, including that it is "unauthorized" by this Court's local rules. ECF No. 155 at 2. They further argue that the statement lacks relevance and that it is "ambiguous; unintelligible; misleading; and containing disputed facts." Id. The fact that the local rules do not contemplate the filing of such a separate statement does not render the statement unauthorized and the Court has considered it, but merely as a guide to the record. As with any summary judgment ruling, the Court bases its decision only on competent summary judgment evidence. See Fed. R. Civ. P. 56.

different lines of fitness products both domestically and internationally. Id. at ¶¶ 2-3. It sells its products directly to consumers through television advertising, catalogs, and the Internet, and also offers products through a network of independent retail companies with stores and websites. Id. at ¶ 3.

Plaintiff Ponani Sukumar is an individual and California resident. ECF No. 138-3, Sukumar Dep. at 13.[2] He founded Plaintiff Southern California Stroke Rehabilitation Associates, Inc. ("SCSRA") in 2004 and is its President. Id. at 13-14, 46. When SCSRA was established, Sukumar intended to utilize the corporation to eventually open approximately 70 stroke rehabilitation centers to treat elderly and medical patients. Id. at 63, 66. His motivation for establishing SCSRA stemmed from his personal experience, starting in 1994, with his elderly father's illnesses. ECF No. 150-10, Sukumar Decl. at ¶ 6.[3] As part of his attempts to help his father regain functionality, he "concluded that strength training equipment would form the nucleus" of his father's rehabilitation plan. Id. When he founded SCSRA, he intended to use strength training equipment in SCSRA's centers, as well. Id. at ¶ 13; see also Am. Compl. ¶¶ 25-29 (explaining that SCSRA was founded in order to generate profit by offering "'traditional' physical rehabilitation in addition to other treatment modalities, including diet, mental and spiritual wellness"; the physical rehabilitation program would use specific types of exercise

---

[2] References to "Sukumar Dep." herein refer to the excerpts attached to Nautilus's memorandum, at ECF No. 138-3. Plaintiffs have separately filed a one-page excerpt from the deposition, see ECF No. 150-7, but that page is included in ECF No. 138-3, as well.

[3] As Nautilus points out, Sukumar's deposition testimony is not always consistent with his later-filed declaration, and Nautilus has requested that the Court strike the declaration in its entirety or disregard it. ECF No. 153 at 6-7 (citing Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) and other authority for the proposition that a party may not create a dispute of fact for summary judgment "simply by submitting an affidavit contradicting his own prior testimony"). The Court agrees that portions of the declaration contradict Sukumar's sworn deposition testimony and thus cannot be considered. Barwick, 736 F.2d at 960. Some of what Nautilus deems to be "conflicting" testimony, however, appears to the Court to simply be clarifying or elaborating on deposition testimony. To the extent that declaration simply elaborates on Sukumar's deposition testimony, but does not contradict it, the Court considers it.

equipment that would work for "frail elderly clients with limited physical strength" and contain certain safety features to "protect compromised clients").

Sukumar explains that he was "most interested in the use of the Arthur Jones inspired core designs of Nautilus's 2ST and [Next Generation ("NG") lines of] machines," but that he believed those machines would have to be modified in order to properly serve the senior fitness and rehabilitation market. Id. at ¶¶ 6, 8. These modifications included features designed to assist elderly or infirm patients to use them safely. See id. at ¶¶ 7-8. Sukumar avers that since the late 1990s, he has "formed and continually refined, very specific concepts and criteria for machines in the senior fitness market." Id. at ¶ 7.

As part of his research, Sukumar purchased a number of different exercise machines from Nautilus and other manufacturers. Id. at ¶ 23(c).[4] SCSRA currently owns approximately 110-120 Nautilus machines that have been purchased either directly by SCSRA or purchased by Sukumar and ownership transferred to SCSRA. Sukumar Dep. at 96-97. Approximately 50-55 of the machines that are the subject of this lawsuit were purchased within the five-year period preceding the filing of suit and are therefore within the applicable statute of limitations. Id. at 148.

Pertinent here, Sukumar claims that in the course of investigating Nautilus machines, he was several times told by Nautilus employees or representatives that Nautilus machines were patented and that Nautilus vigorously protects the machines from patent infringement. Sukumar Decl. at ¶¶ 9-10. Additionally, the Nautilus machines at issue in this lawsuit contained patent labels. Although Nautilus repeatedly points to a portion of Sukumar's testimony as him "conceding" that he did not even look at the patent labels until after he had purchased them, that

---

[4] One of the orders from another company also resulted in litigation brought by Sukumar. See Sukumar v. Health Tech Res., Inc., 2013 WL 930619 (Cal. Ct. App. Mar. 29, 2013).

testimony cannot bear the weight Nautilus assigns it. As explained in Plaintiffs' response, see ECF No. 150 at 24-25, defense counsel's questioning did not ask Sukumar to identify each and every instance he had looked at the patent labels, nor did Sukumar testify that the one instance he mentioned of reviewing the labels was the only time he had looked at them. Moreover, there is additional evidence (including photographs of patent labels taken around 2003) that Sukumar looked at patent labels prior to purchasing the machines at issue in this lawsuit.

As this Court has already ruled, at least some of the patent labels on the machines were false, in that they listed patents that did not apply to that particular machine. Specifically, nine of the machines Nautilus manufactured at its Independence, Virginia plant—six strength machines and three cardiovascular machines—were unpatented and falsely marked. See ECF No. 103 at 5-8. The six strength machines contained labels referencing at least eight inapplicable patents (of twenty-four listed on the label). Likewise, the cardio machines contained labels referencing at least eight inapplicable patents (of sixteen listed on the label). Id.

In addition to purchasing off-the-shelf Nautilus equipment, Sukumar also placed several orders in 1998 and 1999 for a number of customized Nautilus machines that he claims incorporated "certain of [his] innovations." Sukumar Decl. at ¶ 9. He was dissatisfied with the machines as delivered, id. at 11, 15, 23, and eventually filed a breach of contract action against the distributor of those products, Med-Fit Systems, Inc., and against Nautilus, who Sukumar claimed induced Med-Fit to breach its contract with him. See, e.g., Sukumar v. Med-Fit Sys., Inc., 2012 WL 1534098, at *1 (Cal. Ct. App. May 2, 2012). Portions of that case were tried to two different juries and both times, the jury ruled against Sukumar. Id., at *1. He appealed, but the final judgment was affirmed on appeal. See id.

In his declaration, Sukumar claims that around October 2001 and again around February

5

of 2002, he had a "plan to build, deploy, and sell my machines" that would "pitch [him] into direct competition with Nautilus." ECF No. 150-10, Sukumar Decl. at ¶ 11.[5] Because of the patent labels on the machines, however, and the statements by a former Nautilus employee, he thought "obtaining a license was not only required, but . . . also . . . the fair and prudent thing to do." Id. at ¶¶ 11-12. Sukumar testified that he twice sought a license from Nautilus so that he could use Nautilus machines and modify them to his satisfaction, "once in 2004, just before the Direct Focus trial, and once in 2009 through [his] Jones Day lawyers." Sukumar Dep. at 110. At least one of these requests was in the context of a settlement discussion with Nautilus over pending litigation. See Ex. 1 to Sukumar Decl. He now claims that, had he known those machines were not patented—an understanding he claims he has just recently reached as a result of the Court's February 2012 Order—he would have built his own machines at that time *for selling to others* and thus competed directly with Nautilus. This testimony, however, is contradicted by the terms he offered in the settlement letter from his attorneys, in which he claimed he wanted to license Nautilus technology solely for use in SCSRA centers and makes no mention of selling exercise equipment. It also conflicts with his deposition testimony in this case, when he testified that he now has an intention to manufacture and sell his customized machines, but has had that intent only since February 2012.

Additionally, although Sukumar avers he has been working on his modified equipment designs since the late 1990s, he also admitted at his deposition a number of facts that show that neither Sukumar nor SCSRA is presently a competitor of Nautilus. In particular, Sukumar testified that:

- SCSRA has no other employees other than Sukumar (Dep. at 14);

- neither he nor SCSRA has actually created or opened any senior

---

[5]   As discussed below, this allegation contradicts Sukumar's deposition testimony.

spa centers or any stroke rehabilitation centers (Sukumar Dep. at 66-67);

- neither he nor SCSRA have sold any specifically-modified Nautilus equipment, or any machines of his own design and manufacture (Sukumar Dep. at 167, 169, ECF No. 138-4, SCSRA Dep. at 253-54);

- neither he nor SCSRA hold any patents on fitness equipment (Sukumar Dep. at 190);

- SCSRA has not realized a profit in any given year since its inception (SCSRA Dep. at 259); and

- the protocol that Sukumar has developed for assisting patients is not written, but "in [his] mind and [he] put it in effect in the case of [his] father" and discussed it with people (Sukumar Dep. at 171).

Nautilus summarizes these admissions by describing Sukumar as an individual with a "non-functioning business" and contends that, even if SCSRA were in business, it would not operate in the same commercial market as Nautilus." ECF No. 138 at 16, 18, 50. That is, Nautilus manufactures and sells equipment; SCSRA would merely use equipment or make it to use in its own centers.

To counter these facts, Plaintiffs emphasize in their opposition all the efforts they have made since the Court's February 2012 opinion ruling the machines at issue are falsely marked. Sukumar's Declaration, for example, claims that since this Court's February 2012 Order on Plaintiffs' partial summary judgment motion when he learned for certain that the accused machines were falsely marked, Plaintiffs have taken steps and invested time, energy, and resources to become a fitness equipment manufacturer. Sukumar Decl. at 14-15. These include "retain[ing] the services of John Whitman" to "obtain updated research on the senior fitness market" and working to develop a comprehensive business plan that includes "designing, manufacturing, and selling my own line of fitness equipment." Id. at 15. SCSRA is also working with a design house in Utah and two overseas manufacturers to develop prototypes and

manufacture a line of fitness equipment based on Nautilus's core designs. Id. Plaintiffs are in the process of retaining other industry professionals and have "engaged with Gregg Hamann" to purchase land for a California manufacturing facility, with space for "offices, research & development, prototyping fitness equipment, and manufacturing fitness equipment." Id. According to Plaintiffs, these recent efforts support their claim that, were it not for the false patent labels, they could and would have engaged in such efforts previously. Id. at 15-16 (claiming that the false marking impeded Plaintiffs "from building machines based upon the core design elements of Nautilus's NG and 2ST lines of equipment, thereby delaying our entry into this market by nearly 15 years").

Plaintiffs also contend that they have suffered a "variety of cognizable harms directly because of Nautilus's violation of the false marking statute." ECF No. 150 at 5. They specifically identify the following as "competitive injuries" and damages:

i.     Nautilus's false marking deterred and delayed Plaintiffs' entry into the fitness equipment market;

ii.    Plaintiffs incurred unnecessary expenses in attempting to license Nautilus patents;

iii.   Plaintiffs incurred unnecessary expenses in attempting to purchase Nautilus patents/assets;

iv.    Plaintiffs incurred unnecessary expenses in exploring the potential purchase of MedX Corporation, a premium fitness equipment manufacturer, to enter the business of manufacturing and selling fitness equipment;

v.     Plaintiffs incurred unnecessary expenses in analyzing the validity and enforceability of the falsely marked patents; and

vi.    Plaintiffs incurred unnecessary expenses in storing machines they acquired.

Id.

8

In addition to Sukumar's declaration as to these alleged injuries, Plaintiffs have also submitted the affidavit and report of a purported valuation expert, James Pampinella.[6] Pampinella opines that, as a result of the Nautilus's false marking, Plaintiffs have incurred between $94,000 to $142,700 in "unnecessary legal costs," $132,000 in the unnecessary purchase and modification of MedX Machines, and $242,000 in unnecessary storage costs, for a total amount of estimated damages of $468,164 to $516,679.

## B.    Procedural History

As alluded to above, this lawsuit is not the first between the parties, nor is it the only one currently pending. Instead, there is a thirteen-year history of litigation brought by one or both of the Plaintiffs against Nautilus.[7] Prior complaints brought in both state and federal courts have included claims for breach of contract, breaches of warranty, and fraud. See ECF No. 138 at 1 & cases cited in n.1.

The Plaintiffs originally filed the instant suit against Nautilus in the Central District of California, accusing it of falsely marking a number of its machines in violation of 35 U.S.C. § 292 ("Section 292"). See Compl., ECF No. 1. On Nautilus's motion, ECF No. 20, the case was transferred to this District, in part because the accused machines were manufactured at a former Nautilus plant located in Independence, Virginia. See ECF No. 34. This Court then stayed the

---

[6] Nautilus objects to Pampinella's report on various grounds. The Court has considered the affidavit, but concludes that it does not provide any competent evidence that Plaintiffs' alleged injuries were caused by Nautilus's false marking. Thus, it does not prevent the grant of Defendant's summary judgment motion.

[7] The Court mentions these prior lawsuits not because it agrees with Defendant's allegations that Plaintiffs are seeking "payback" or engaged in a "long litigation war of attrition," ECF No. 138 at 9, but because some of the claims Plaintiffs made in these other lawsuits are inconsistent with claims asserted in the instant case, as discussed herein. Indeed, the Court does not accept Nautilus's interpretation of the instant lawsuit as Plaintiffs' attempts at "payback" or vendetta litigation, particularly given the Court's prior ruling that some Nautilus machines were in fact falsely marked. But the parties' relationship is certainly not a friendly one—even Sukumar acknowledges that he is "deeply aggrieved" and personally offended by Nautilus's conduct. In his declaration, he avers that "Nautilus has repeatedly denigrated [his] attempts to pursue [his] goals." Sukumar Decl. at 17.

action for approximately two months in 2011, pending final Congressional action on legislation that could affect the outcome of the case. See ECF No. 51.

On September 16, 2011, President Obama signed into law the Leahy-Smith America Invents Act ("AIA"), which amended Section 292 to eliminate its *qui tam* provisions and include a competitive injury requirement for private plaintiffs. The amendment applied to all cases pending on that day, or filed after that day.[8] In response, the Plaintiffs filed a First Amended Complaint explicitly alleging competitive injury and adding California and Washington state law claims. In their First Amended Complaint, Plaintiffs assert four causes of action:

> (1) false patent marking in violation of 35 U.S.C. § 292;
>
> (2) false advertising under California law (Cal. B. & P. Code § 17500);
>
> (3) unfair/unlawful business practice under California Law (Cal. B. & P. Code § 17500); and
>
> (4) violation of the Washington Consumer Protection Act (Wash. RCW § 19.86.020).

ECF No. 69. In a prior order granting in part and denying in part Plaintiffs' partial summary judgment motion, the Court ruled as a matter of law in Plaintiffs' favor on some aspects of those claims, including a ruling that some of the accused machines were falsely marked.[9] ECF No.

---

[8] The Supreme Court recently denied certiorari in a case that sought review of the Federal Circuit's ruling that the retroactive elimination of *quit tam* status did not violate due process rights. See Public Patent Foundation Inc. v. McNeil-PPC, Inc., 134 S. Ct. 319 (Oct. 7, 2013) (order denying petition for writ of certiorari); see also Brooks v. Dunlop Mfg. Inc., 702 F.3d 624, 625-26 (Fed. Cir. 2012) (expressing holding of Federal Circuit).

[9] Specifically, the Court ruled that:

> (1) Defendant falsely marked unpatented articles (certain of the accused machines) within the meaning of Section 292 of Title 35 of the United States Code;
> (2) Defendant intended to dispose of real or personal property within the meaning of Section 17500 of the California Business and Professions Code;

103. Neither party is asking the Court to revisit these rulings, and they have no bearing on the issues of damages on which the Court grants summary judgment. Put differently, because of the lack of any actual damages or harm to Plaintiffs caused by Nautilus's false marking, it is immaterial—for purposes of this opinion—whether Defendants falsely marked their products and whether they did so with an intent to deceive, and whether any of the state law statutes were violated by Nautilus's conduct.

## II.   STANDARD OF REVIEW

"[T]he function of a motion for summary judgment is to smoke out if there is any case, i.e., any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition." Bland v. Norfolk & S. R. R. Co., 406 F.2d 863, 866 (4th Cir. 1969). Summary judgment is proper where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a summary judgment motion, the court must consider the evidence in the record as a whole, see Ricci v. DeStefano, 557 U.S. 557, 586 (2009), and must draw "all reasonable inferences . . . therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). Summary judgment should be entered if the Court concludes that no reasonable jury could return a verdict for the non-moving party. See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 958-59 (4th Cir. 1996).

---

(3) Defendant's false marking was committed in the conduct of any trade or commerce, within the meaning of Section 19.86.020 of the Revised Code of Washington; and
(4) Defendant's false marking impacted the public interest within the meaning of Section 19.86.020 of the Revised Code of Washington.

ECF No. 103.

## III.  DISCUSSION

### A.  The False Marking Statute (35 U.S.C. § 292)

An entity violates Section 292 when it (1) falsely marks an unpatented article; and (2) does so for the purpose of deceiving the public. 35 U.S.C. § 292(a). As the Court has noted, the statute was revised in 2011 to require that where, as here, a private actor instead of the government is suing to enforce a violation of the statute, that actor must have suffered "competitive injury." 35 U.S.C. § 292(b).

The Congressional history of the AIA is clear that the purpose of including the "competitive injury" was to eliminate *qui tam* actions because of the prevalent abuse of such actions. As one Senator explained, "Currently, such [*qui tam*] suits are often brought by parties asserting no actual competitive injury from the marking—or who did not even patent or manufacture anything in a relevant industry. Many cases have been brought by patent lawyers themselves claiming the right to enforce a fine of $500 for every marked product." 157 Cong. Rec. S5319-5321, at 5320 (daily ed. Sept. 6, 2011)(statement of Sen. Kyl); see also Fisher-Price, Inc. v. Kids II, Inc., 2011 WL 6409665, at *9 (W.D.N.Y. Dec. 21, 2011)(citing same); RB Rubber Prods., Inc. v. ECORE Int'l, Inc., 2012 WL 4068557, at *9 (D. Or. Sept. 14, 2012)(citing same). Certainly, this confirms that the amendment was intended to eliminate plaintiffs with no connection to the false marking and to limit private plaintiffs permitted to sue under § 292 to a specific group: persons or entities who could show a competitive injury from the false marking. The question before the Court is whether Plaintiffs here are included in that group.

Nautilus contends that Plaintiffs cannot show a "competitive injury" and thus that their

false marking claims fail as a matter of law.[10] Nautilus focuses primarily on the fact that neither Sukumar nor SCSRA is a competitor of Nautilus. It also contends that neither Plaintiff has suffered any injury as a result of any false marking. In support of these points, Nautilus relies heavily on the sworn deposition testimony of Sukumar and on his testimony as the corporate designee of SCSRA. In particular, Nautilus focuses on his admissions that neither Plaintiff has ever manufactured or sold a single piece of exercise equipment and that they hold no patents related to any such equipment. Thus, Nautilus challenges Sukumar's assertion that Plaintiffs "compete" with Nautilus both as disingenuous and as defying common sense.

Nautilus argues that Plaintiffs have failed to identify any specific instances of competitive loss and, in particular, have failed to prove that it was the patent labels that caused any injury to their business. Nautilus emphasizes that the patent labels themselves were not the source of any impediment to Plaintiffs' business expansion. Nautilus further posits that any assertions Plaintiffs "overpaid" for any given machine because they believed it was covered by patents and it was not, just shows they were consumers, not competitors. Nautilus also maintains that Plaintiffs' argument that the patent labels prevented them from entering the market is contradicted by their claims made in other litigation as well as Sukumar's testimony here.

In response, Plaintiffs assert that they suffered a "competitive injury" within the meaning of the false marking statute because as a potential competitor, they were competitively injured when they were impeded in their efforts to enter the market and incurred "unnecessary costs." ECF No. 150 at 7-10 (citing Forest Group, Inc. v. Bon Tool Co., 590 F.3d 1295, 1303 (Fed. Cir. 2009)). They also point to the categories of damages described above as their specific and non-speculative losses allegedly caused by the false marking.

---

[10]   In light of its ruling, the Court does not address Nautilus's separate arguments that Sukumar, as an individual, has no standing and no damages in light of the fact that he does not personally own any of the accused machines.

In support of their position, Plaintiffs rely most heavily on Forest Group, supra, a pre-AIA decision from the Federal Circuit. In discussing the purpose and policies behind the false marking statutes, the Forest Group Court explained:

> The marking and false marking statutes exist to give the public notice of patent rights. "Congress intended the public to rely on marking as a 'ready means of discerning the status of intellectual property embodied in an article of manufacture or design.'" Clontech Labs. [v. Invitrogen Corp., 406 F.3d 1347, 1356 (Fed. Cir. 2005)] (quoting Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 162 (1989)). Acts of false marking deter innovation and stifle competition in the marketplace. 7 Donald S. Chisum, Chisum on Patents § 20.03[7][c][vii] (2009). If an article that is within the public domain is falsely marked, **potential competitors may be dissuaded from entering the same market**. False marks may also deter scientific research when an inventor sees a mark and decides to forego continued research to avoid possible infringement. See Bonnie Grant, Deficiencies and Proposed Recommendations to the False Marking Statute: Controlling Use of the Term "Patent Pending", 12 J. Intell. Prop. L. 283, 283 (2004). False marking can also cause unnecessary investment in design around or costs incurred to analyze the validity or enforceability of a patent whose number has been marked upon a product with which a competitor would like to compete. Cf. Clontech Labs., 406 F.3d at [1357] n. 6 ("In each instance where it is represented that an article is patented, a member of the public desiring to participate in the market for the marked article must incur the cost of determining whether the involved patents are valid and enforceable.").

590 F.3d at 1302-03 (emphasis added).

Although Plaintiffs strain to urge that the emphasized language above is applicable here and supports their claims, that language must be understood in its proper context. Perhaps most importantly, Forest Group was decided before the AIA, and the issue before the court was whether the $500 fine in the statute should be applied on a per article basis. Thus, in no way was the issue presented here implicated in that case. Additionally, it was undisputed that there, the

parties were in fact competitors.[11] See 590 F.3d at 1299. Notably, moreover, the discussion in that portion of the opinion was focused on the general harms from false marking. Indeed, some of the precise harms that Plaintiffs claim here, e.g., unnecessary investment in design around costs, or costs incurred to analyze the validity or enforceability of patents, are described in Clontech Labs as hurting "a member of the public [who] desir[es] to participate in the market for the marked article." 406 F.3d at 1357 n.6 (emphasis added). Those harms would not be competitive injuries, therefore, but instead harms suffered by the general public. Finally, what that excerpt does not say is also significant. While the Forest Group court recognized that a harm from false marking is that potential competitors may be dissuaded from entering the same market, it did not state that such a harm would constitute a "competitive injury."

At the oral arguments held before the Court, both parties acknowledged that the issue of whether a potential competitor can assert a claim under the amended statute has not yet been addressed explicitly by any court and that it is thus an issue of first impression. Although they have not addressed directly whether a potential competitor can suffer a "competitive injury," a number of federal district courts have attempted to define or discuss what the term means in the context of Section 1292. For example, in Greene v. Ab Coaster Holdings, Inc., 2012 WL 4442749 (S.D. Ohio Sept. 25, 2012), the Court explained:

> The statute does not define competitive injury, however, 'competitive injury' has been generally defined as '[a] wrongful economic loss at the hands of a commercial rival ....' " U.S. ex rel. FLFMC, LLC v. TFH Publications, Inc., No. 10–CV–5477, 2012 WL 1337557, at *4 (D.N.J. Apr 18, 2012) (citing Black's Law Dictionary 302 (8th ed. 2004). See also Rogers v. Conair Corp., No. 10–1497, 2012 WL 1443905, at *4 (E.D. Pa. Apr. 25, 2012) ("To establish standing under the [America Invents Act], Plaintiff

---

[11] Forest Group, Inc., the defendant on the false marking claim, was a licensor, manufacturer, and seller of the stilts bearing the patent label. Bon Tool Co., the plaintiff in the false marking claim, was a tool reseller who purchased replica stilts from another manufacturer without a license from Forest Group. 590 F.3d at 1299.

must allege a tangible economic loss caused by the illegal competitive means (*i.e.,* the false patent marking).") (citing <u>Advanced Cartridge Tech., LLC v. Lexmark Int'l, Inc.,</u> No. 10–486, 2011 WL 6719725, at *2, 4 (M.D. Fla. Dec. 21, 2011) and <u>Fisher–Price, Inc. v. Kids II, Inc.,</u> No. 10–988, 2011 WL 6409665, at *9 (W.D.N.Y. Dec. 21, 2011)). "Formulated differently, a competitive injury is a business loss caused by a competitive means, including false patent marking, that the law forbids." <u>Advanced Cartridge Tech., LLC,</u> 2011 WL 6719725, at *2 (citation omitted).

<u>Greene</u>, 2012 WL 4442749, at *11.

Selecting particular language from any of those cases cited in <u>Greene</u> above, or from any of the cases cited by the parties, can easily result in a sense that either Plaintiffs or Nautilus are "right" on the law concerning potential competitors. For example, some cases contain language that seems clearly limited to those already competing in some way. <u>See, e.g.,</u> <u>FLFMC, LLC,</u> 2012 WL 1337557, at *4 (a competitive injury "has been generally defined as '[a] wrongful economic loss at the hands of a commercial rival"); <u>RB Rubber Prods., Inc.,</u> 2012 WL 4068557, at *9 (surveying post-AIA decisions and concluding that "competitive injury exists where the parties are in competition in the relevant market and the alleged false marking harms the plaintiff's ability to compete"). The <u>RB Rubber Prods.</u> Court also noted that courts have drawn analogies to the Lanham Act, which creates a rebuttable presumption of competitive injury where the parties are competitors and the alleged conduct has the tendency to confuse consumers. <u>Id.</u> at *9;[12] <u>see also</u> <u>Ira Green, Inc. v. J.L. Darling Corp.,</u> 2011 WL 6218146, at *4 (W.D. Wash. Dec. 5, 2011) (applying, in false marking context, Ninth Circuit's definition of competitors under the Lanham Act as those who "vie for the same dollars from the same consumer group") (citation omitted).

---

[12] <u>RB Rubber Prods.</u> involved two parties who were clearly competitors because "they manufacture[d] similar and competing products." 2012 WL 4068557, at *9. Thus, as with the other cases cited herein, the Court there had no occasion to address whether a competitive injury could occur where a party is a potential competitor only.

16

Other cases contain language that at least does not exclude potential competitors. See, e.g., Rogers, 2012 WL 1443905, at *4 (competitive injury requirement is satisfied if plaintiff suffers a "business loss" caused by a forbidden competitive means, "i.e., the false patent marking"). In at least two cases, moreover, district courts employed reasoning suggesting that a plaintiff could suffer a competitive injury by being prevented from entering a market. Specifically, in both Greene and Kids II, the party asserting the false marking claim was actually selling a product that was a competing product. In both cases, the courts determined that because the party seeking relief had not shown "it was actually deterred from competing in the market by an injury caused by allegedly false patent markings," no competitive injury had been shown. Greene, 2012 WL 4442749, at *13-14; Kids II, 2011 WL 6409665, at *9-10. Put differently, because the plaintiff actually entered the marketplace and sold competitive products, they had not shown that they were prevented from entering the relevant market and not shown a competitive injury. Plaintiffs point to those decisions as supporting their claims because, while Plaintiffs are not yet competing with Nautilus, they have alleged that they were prevented from doing so because of Nautilus's actions in claiming patent protection for machines via their labels where there was no such protection. That is, Plaintiffs contend they were unable to enter the marketplace and thus that their situation is the converse of the plaintiffs' situation in Greene and Kids II.

The Court understands that the issue of whether potential competitors may suffer a competitive injury under Section 292 is both an issue of first impression and perhaps an interesting legal issue. In the case before it, however, the Court need not rule that a potential competitor can never state a claim for competitive injury, or that a plaintiff must already be a competitor or commercial rival to suffer a competitive injury. Instead, the Court simply

concludes that here, based on the specific facts before it, no reasonable jury could find that <u>these</u> <u>specific</u> Plaintiffs have suffered a competitive injury caused by Nautilus's false marking. That is, the Court is firmly convinced that Plaintiffs here have not made any such showing and that no reasonable jury could find that Plaintiffs' failure to compete or any of their claimed damages are a "competitive injury" resulting from Nautilus's false marking.

To explain why, the Court addresses first the overall claim that Plaintiffs were prevented from entering the market and competing with Nautilus, a claim that underlies all of their damages claims as a factual matter. It will then address Plaintiffs' remaining claimed injuries.

### 1.    Prevention of Entry into the Market

<u>Greene</u> and <u>Kids II</u>, the two cases offering some implicit support for Plaintiffs' argument that being prevented entry into the market could constitute a competitive injury, involved actual competitors. Thus, they did not address what being prevented from entering a market means in the context of a potential competitor. At a minimum, however, the Court believes it must mean that the entity was capable or able to compete (or actively trying to do so), but that the false marking impeded those efforts in some concrete way. A competitor must do more than show it had a desire to compete, and that it did not attempt to compete out of a fear of infringing another's patent. This minimal showing is all that Plaintiffs have made, however, and thus their claim of being prevented entry into the market as a result of the false marking fails.

It is true that Mr. Sukumar has alleged that Nautilus's false marking deterred and delayed Plaintiffs from entering the marketplace, and testified generally that his fear of infringing on what he believed to be valid patents on various machines deterred and delayed Plaintiffs. But his conclusory testimony is not enough to defeat summary judgment. <u>See</u> <u>Dash v. Mayweather</u>, 731 F.3d 303, 325 (4th Cir. 2013) ("Conclusory allegations and speculative assertions ... without further legitimate support clearly do not suffice to create a genuine issue of material fact.")

18

(citations and alterations omitted). It simply defies common sense to conclude that, for more than ten years, Plaintiffs have not entered the market to compete with Nautilus and that the sole item holding them back was their fear of infringing patents that were falsely listed on the accused machines' patent labels.[13]

Moreover, the subjective fear that, by entering a market you may infringe upon another's patent, is insufficient to establish a "competitive injury." If it were sufficient, Section 292 would allow a very broad category of plaintiffs indeed—anyone who simply states that they had the ambition or desire to compete, but were afraid of infringing a patent that turned out to be falsely marked. Indeed, the Federal Circuit has rejected a subjective fear of a patent infringement action as a sufficient injury to convey standing. See, e.g., Prasco, LLC v. Medicis Pharm. Corp., 537 F.3d 1329, 1338-39 (Fed. Cir. 2008) ("[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm" sufficient to establish standing) (citing Lair v. Tatum, 408 U.S. 1, 13-14 (1972)); Indium Corp. of Am. v. Semi-Alloys, Inc., 781 F.3d 879, 883 (Fed. Cir. 1985) (a "purely subjective apprehension of an infringement suit is insufficient to satisfy the actual controversy requirement" to establish standing). In short, finding a "competitive injury" because a plaintiff subjectively feared infringing and thus did not enter the market, would eviscerate the "competitive injury" requirement. Thus, this first category of supposed "competitive injury" is not one that can support Plaintiffs' false marking claim.

Sukumar may well have the best of intentions, and grand designs, plans, and excellent

---

[13] Nautilus describes this in more stark terms: "Plaintiffs' purported injuries and every related allegation of "damage" depends on a single, unreasonable presumption: that if only Nautilus had placed accurate labels on the exercise machines, Plaintiff[s] would have (1) started a major business; (2) succeeded in creating the business; (3) entered Nautilus's marketplace in the fitness industry (despite the fact Plaintiffs claim to be trying to enter an entirely different market); and (4) would have then become a "powerful" competitor of Nautilus. ECF No. 151 at 3-4.

ideas about how to compete with Nautilus. And it may well be that he has now begun in earnest—since this Court's February 2012 opinion—to turn those dreams into reality. But concerted efforts <u>after</u> a lawsuit is filed or a partial decision rendered is not proof a jury can rely on to determine that the reason those efforts were not taken sooner was because of false patent labels.[14] This is particularly true because Sukumar has repeatedly blamed other actions of Nautilus—not any false patent labels—for the years of delay in accomplishing his business objectives and he has done so both in prior litigation and in his deposition in this case. For example, Sukumar's deposition testimony contains repeated references to his fervent belief that Nautilus's conduct other than false marking, including its unwillingness or inability to provide satisfactorily-modified equipment, has impeded his progress and efforts toward establishing a successful business. <u>See, e.g.</u>, Sukumar Dep. at 68 (blaming Nautilus's non-delivery of equipment for "stym[ing]" Plaintiffs' efforts to create documents comparing the projected costs or expenses of stroke rehabilitation facilities versus senior spa centers); <u>id.</u> at 170 (blaming Nautilus's late delivery and failure to deliver products as promised originally for delaying his father's treatment); <u>cf. id.</u> at 184 (claiming he has "an intent to now" sell machines to compete with Nautilus after being "thwarted for 12 years"); <u>id.</u> at 193-94 (reaffirming his trial testimony from September of 2010 that the reason he didn't go forward with his stroke rehabilitation center plans (which had been on hold for close to eight or nine years at that point) was because he had not received seven next generation machines and then explaining that there are a "lot of issues involved in going forward" and that it will now finally happen because he knows the machines are not patented); <u>id.</u> at 194 (claiming he "was duped for all this time").

While Sukumar may sincerely believe that Nautilus, through its conduct, has repeatedly

---

[14] They are also insufficient, in and of themselves, to establish an injury, since questions of standing are viewed as of the time the complaint is filed. See <u>Payne v. TR Assocs., LLC</u>, 880 F. Supp. 2d 702, 706 (E.D.N.C. 2012).

sabotaged SCSRA's development, it requires a great amount of imagination, and leaps wholly unsupported by the factual record before the Court, to conclude that if not for Nautilus's <u>false marking</u> of its machines, the road to Plaintiffs' development of competing machines and rehabilitation or spa centers would have been swift and easy and that SCSRA would be competing with Nautilus today. Any "competitive injury" is simply not supported by the evidence before the Court and would require the jury to engage in impermissible speculation and conjecture. In short, Plaintiffs are neither current competitors nor sufficiently close to competing (and certainly not at the time the First Amended Complaint was filed) that they can prove a "competitive injury."

Plaintiffs' complaints of competitive injury based on being deterred from entering the market fail for the additional reason that there is insufficient evidence—aside from Sukumar's protestations in his declaration[15]—that Plaintiffs ever intended to compete with Nautilus in the relevant market of manufacturing and selling exercise equipment prior to filing this lawsuit. Instead, Sukumar claims he <u>began</u> to compete after learning, from this Court's prior order on Plaintiffs' motion for summary judgment that Nautilus's patent labels were false. Specifically, he testified at his deposition that he previously sought a license from Nautilus to manufacture machines that would be "used exclusively in facilities owned by SCSRA" (<u>i.e.,</u> not sold to others), but that he decided <u>after</u> this Court's February 2012 order that he would "make [his] own machines [for resale] and further [his] business prospects that way." Sukumar Dep. at 161. In the same answer, he confusingly states that making machines for resale was also part of his "other prior intent," but he indisputably states that the licensing, for example, was sought solely to have

---

[15] There is also testimony from Mr. Smith, a former Nautilus representative, that Sukumar told him in 2001 and 2002 that he wanted to design, manufacture, and sell senior fitness equipment. But Sukumar himself has admitted that was not the case until after the lawsuit was filed. His admission is controlling.

machines to use in SCSRA facilities. This testimony establishes that, neither at the time they filed their lawsuit, nor when they first amended to state a "competitive injury," did Plaintiffs intend to compete in the relevant market in which Nautilus operates–the sale of exercise equipment.[16]

While Plaintiffs' aims may now have morphed into wanting to manufacture and sell exercise equipment, the ever-changing aims and goals of SCSRA are further proof that Plaintiffs were not sufficiently established as a business that they suffered a "competitive injury" as a result of Nautilus's false marking.[17] Although Sukumar alleges that he has been deterred from competing with Nautilus market because of the patent labels (which he now knows are incorrect), it is not at all clear to the Court that, even if all of SCSRA's plans had been realized, it would be competing in the same market as Nautilus. Put differently, although he now claims he wants to manufacture and sell equipment directly to consumers or retailers, his testimony in other lawsuits and in his deposition in this case, suggest that was not Plaintiffs' aim or intention, at least not until after this lawsuit was filed. Whatever the limits of a potential competitor's claim of "competitive injury," such an injury cannot include an entity that does not even decide it wants to compete in the relevant market until after its false marking lawsuit is filed. A plaintiff cannot create a "competitive injury" by intentions or business plans or the hiring of consultants, when those efforts begin after a lawsuit has been filed. For all of these reasons, the Court

---

[16] Sukumar alleges in his declaration that SCSRA intends to also sell and manufacture its modified equipment, but that was not the focus of the SCSRA as described in previous cases or as fairly gleaned from his deposition testimony. As noted supra at note 2, to the extent that his declaration is inconsistent with his deposition testimony, the latter controls.

[17] In their reply, Nautilus relies on the lack of any intention to compete in the relevant market until after the Court's February 2012 Order as a lack of standing. See ECF No. 151 at 33-36. However analyzed (whether as a lack of statutory or prudential standing, see generally Advanced Cartridge Techs., LLC v. Lexmark Int'l, Inc., 2011 WL 6719725 (M.D. Fla. Dec. 21, 2011), or a lack of evidence that the damages were proximately caused by false marking), the Court is firmly convinced that the claim should not proceed to trial.

concludes that Plaintiffs have not shown they were prevented from entering the market of manufacturing and selling exercise equipment by Nautilus's false marking.

## 2.    Other Claimed Damages

As noted, Plaintiffs also allege that they have suffered a variety of other harms as a direct result of Nautilus's false marking. In particular, they contend they have devoted "unnecessary" expenses to: 1) attempting to license Nautilus patents; 2) attempting to purchase Nautilus patents or assets; 3) exploring the purchase of Med-X; 4) analyzing the validity of Nautilus patents; and 5) storing Nautilus machines Plaintiffs owned.[18]

For the same types of reasons discussed in the preceding section, none of these other alleged damages are competitive injuries. In short, Plaintiffs are neither competitors nor sufficiently close to competing to state a valid claim for "competitive injury"; it would require too much speculation on the part of any jury to designate any of these damages as a competitive injury.

These categories of alleged damages fail for additional reasons as well, and these additional reasons are equally applicable to the state law claims. First, as to the attempts to license, the attempts to purchase Nautilus patents, and the attempts to purchase Med-X, the Court has already explained that Plaintiffs undertook licensing and related efforts to obtain access to

---

[18] Although not listed as one of their claimed damages, Plaintiffs also complain that they "overpaid" for Nautilus machines that they thought were protected by patents but were not. To the extent Plaintiffs are claiming these as damages, the Court concludes that summary judgment is appropriate as to these alleged damages for two independent reasons. First, there is no evidence, based on anyone's personal knowledge, that the price of Nautilus machines was higher as a result of the patent labels affixed to them; instead, there is uncontroverted affidavit testimony that is not the case. See ECF No. 138-6, Murdock Decl. at ¶¶ 7-8. Second, even if there were such evidence, such damages would not constitute a competitive injury. See, e.g., Stauffer v. Brooks Bros., Inc., 2012 WL 6621374, *4 (S.D.N.Y. Dec. 19, 2012) (a competitive injury is one suffered as a defendant's competitor, not as its customer; thus, an allegation that deceptive marking practices "chilled competition and thus inflated the price plaintiff paid" for the product is not a competitive injury).

Nautilus technology only to use the machines in its planned centers. The licensing attempts, in particular, were part of an effort to settle pending litigation. This litigation was unrelated to any claims of false marking. Plaintiffs simply have not presented evidence from which a reasonable jury could find that these categories of costs incurred were caused by the false patent labels on the accused machines. Indeed, in his deposition, Sukumar appears to be attributing his belief that the machines were covered by patents at all to alleged oral representations by Nautilus regarding patent protection generally on its machines, but not by the false labels themselves. See, e.g., Sukumar Dep. at 110-11 (he felt that certain modifications to Nautilus machines already in his possession could involve him in a Nautilus patent infringement lawsuit "[b]ased on Greg Webb's and a whole host of other people from Nautilus telling him" that it could infringe Nautilus patents to make such modifications").

With regard to the storage fees and legal fees incurred in analyzing the validity of the patents, there is likewise no evidence that these expenses incurred were caused by the false marking. As to the "storage fees," the Court notes that Plaintiffs have changed the reason, over the course of various lawsuits, as to the alleged cause of those damages. That is, as noted and supported by Nautilus, see ECF No. 151 at 28-31, Sukumar has previously blamed other purported causes in seeking these precise damages, including Nautilus's breaches of contract or warranties. Indeed, in a filing with another court filed after this lawsuit, Sukumar claimed he incurred these storage fees as a result of Nautilus's breach of warranty. See ECF No. 151 at 30-31; 151-5 at 16.) Additionally, Sukumar testified that he continued to purchase Nautilus equipment—including the fifty machines purchased since 2005 despite believing he could not modify them—simply to "see what's the latest and greatest in the field of Nautilus." Sukumar Dep. at 147-48. If he believed he could not modify them, however, and consequently believed he

24

could not use them in his business, he cannot recover storage fees incurred for storing equipment he had no intention of using in his business. To allow recovery of that element of damages would be far afield from the direct causation required under both Section 292 and the state laws.[19] <u>See, e.g.</u>, <u>Kiwkset Corp. v. Superior Ct.</u>, 246 P.3d 877, 888 & n.9 (Cal. 2011) (to show causation under California's Unfair Competition Law in a case where there is an allegation of misrepresentation or deception, a plaintiff must demonstrate actual reliance on the deceptive statements and that the statement was "an immediate cause of the injury-producing conduct").

Similarly, as to whether Plaintiffs incurred "unnecessary" attorneys' fees, they contend (through the declaration of James Pampinella at 15) that the fees were for "work performed to determine the validity and enforceability of Nautilus's patents." Again, Plaintiffs have not shown how this is a competitive injury or affected their ability to compete. Instead, it seems that fees incurred in determining the validity of patents are a generic type of harm at best, and not proof here that Plaintiffs were competitively injured. Additionally, these fees were not "unnecessary" costs—they formed the basis of this lawsuit. With regard to the California statutes, moreover, attorneys' fees are not recoverable in such an action. <u>See</u> <u>Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.</u>, 973 P.2d 527, 539 (Cal. 1999). Thus, to allow those same fees as an element of "damages" would do an end-run around that statute's prohibition on recovery of attorneys' fees.

All of the harms alleged here are simply too removed from the false patent labels to be a competitive injury—or any other type of direct injury—caused by the <u>false labels</u>. Other courts have held that such a speculative causal connection was insufficient to show a competitive

---

[19] Nautilus also points to Sukumar's acknowledgement that he placed and received another order of Nautilus machines about a year after he filed this lawsuit. The Court is constrained to agree with Nautilus that this fact shows Plaintiffs are purchasing Nautilus equipment for "their purposes—whatever that may be—regardless and irrespective of any patent labels or alleged 'deceit.'" ECF No. 138 at 48. While Plaintiffs' response claims they purchased these machines to investigate further false marking allegations against Nautilus, the cost of those machines and the cost of storing them cannot be deemed a competitive injury or an injury <u>caused by</u> the labels.

injury. In <u>Rogers v. Conair Corp.</u>, 2012 WL 1443905, *4 (E.D. Pa. Apr. 25, 2012), for example, the district court dismissed the plaintiff's false marking claim and specifically held that the complaint failed to allege any actual competitive injury. In particular, the plaintiff had not alleged any fact from which the Court could find "a plausible causal connection between [difficulties in his business, such as "difficulty obtaining retail shelf or selling his product"] and Conair's marking practices." <u>Id.</u> Other cases are in accord. <u>See, e.g.</u>, <u>Two Moms and a Toy, LLC v. Int'l Playthings, LLC</u>, 898 F. Supp. 2d 1213, 1217-18 (D. Colo. 2012) (rejecting false marking claim by a non-competitor because the plaintiff had not alleged an actual competitive injury, but only that it "could lose or could have already lost potential licensees"); <u>Advanced Cartridge Techs., LLC v. Lexmark Int'l, Inc.</u>, 2011 WL 6719725, at *3-5 (M.D. Fla. Dec. 21, 2011) (addressing competitive injury as one of three types of "standing" and concluding that a lack of direct harm precluded the plaintiff's claim as much as a lack of direct competition; also holding that even if plaintiff could prove lost licensing money because of false marking the harm would be "too derivative or indirect to support prudential standing"); <u>McCabe v. Floyd Rose Guitars</u>, 2012 WL 1409627 (S.D. Cal. Apr. 23, 2012) (dismissing claim because plaintiff failed to plead a competitive injury).

For the foregoing reasons, the Court will grant summary judgment in Nautilus's favor on Plaintiff's claim under 35 U.S.C. § 292.

### B.    State Law Claims

It is true that none of Plaintiffs' state law claims require a competitive injury, but they do all require damages caused by the mismarked labels. The Court explains the elements of each of the state law claims briefly below, but relies on its reasoning from Section A, <u>supra</u>, as to the lack of proof of causation. That is, for the same reasons that the Court has already explained,

26

Plaintiffs have failed to show that any of their claimed damages were caused by the false marking of the Nautilus machines and thus their state law claims all fail.

### 1. California Claims (Cal. Bus. & Prof. Code § 17500)

The California False Advertising Law ("FAL") makes it unlawful for an entity, with intent to dispose of real or personal property, to make or disseminate or cause to be disseminated, "any statement concerning that real or personal property . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500 (West 2008). Similarly, California's Unfair Competition Law ("UCL") is violated by "any unlawful, unfair, or fraudulent business act or practice."

No damages are available under either the California FAL or the UCL to a private litigant. Only injunctive relief and non-mandatory restitution are available to a private litigant. See Pineda v. Bank of Am., N.A., 241 P.3d 870, 878-79 (Cal. 2010). To recover even these limited remedies, however, Plaintiffs must demonstrate causal injury, i.e., they must show either an "injury in fact" or "lost money or property" as a result of the false marking. Cal. Bus. & Prof. Code § 17204; id. at § 17535; see also Kwikset Corp., 246 P.3d at 885 (to satisfy standing under the FAL and UCL, a plaintiff must establish an economic injury that was caused by the "gravamen of the claim"); ECF No. 150 at 27 (Plaintiffs acknowledging same). Although Plaintiffs claim they have lost money as a result of Nautilus's false marking, the Court concludes that no reasonable jury could so conclude, for the reasons previously set forth.

2.    **Washington Consumer Protection Act Claim**
      **(Wash. Rev. Code § 19.86.020)**[20]

Likewise, to recover under the Washington statute, Plaintiffs must demonstrate an injury to their business or property and "but for" causation, i.e., that, "but for the defendant's unfair or deceptive practice, the plaintiff[s] would not have suffered an injury." ECF No. 138 at 47 (quoting Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash. Inc., 170 P.3d 10, 22 (Wash. 2007); Goel v. Jain, 259 F. Supp. 2d 1128, 1142 (W.D. Wash. 2003) (setting forth elements of claim as including a showing that the unfair or deceptive act or practice caused injury to the plaintiffs' business or property). Again, for the reasons already discussed, none of the categories of damages claimed by Plaintiffs fairly can be said to have been caused by Nautilus's false patent labels.

IV.    **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment, ECF No. 138, is **GRANTED** and Plaintiffs' Motion for Partial Summary Judgment, ECF No. 136, is **DENIED AS MOOT.** An appropriate Order shall issue this day.

**ENTER**: This ___6___<sup>th</sup> day of December, 2013.

_____
Senior United States District Judge

---

[20] As noted by the Court in its prior order, see ECF No. 103 at 16 n.7, the parties have not addressed in any detail whether or not the Washington statute is one of extraterritorial application. Because of its ruling that Plaintiffs have not established damages on this claim, the Court will assume without deciding that the Washington law is applicable here. But see Illinois Tool Works, Inc. v. Seattle Safety, LLC, 2010 WL 4668447, at *11-*12 (W.D. Wash. 2010) (rejecting claim where the plaintiff failed to show that the alleged violations affected the people of the state of Washington).